UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

JULIAN PEREZ ARELLANO,

    Petitioner,

v.

ROBERT CERNA, et al.,

    Respondents.

No. 1:26-CV-050-H

## ORDER

Before the Court is Julian Perez Arellano's petition for a writ of habeas corpus. Dkt. No. 1. Perez Arellano illegally entered the United States over two decades ago. Because he does not have legal status, he was apprehended by immigration officials and detained without bond. He contends that the Central District of California's orders in *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, entitle him to a bond hearing. But as the Court previously explained, it is not bound by the orders in *Maldonado Bautista*. *Calderon Lopez v. Lyons*, ___ F. Supp. 3d ___, 2025 WL 3683918, at *7–11 (N.D. Tex. Dec. 19, 2025). And under binding Fifth Circuit precedent, Perez Arellano is an "applicant for admission" who must be detained without bond under Section 1225(b)(2)(A) of the INA. *See Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026).

Because the legal arguments and facts presented in the petition are indistinguishable from those addressed in the Court's prior decisions denying relief, "it appears from the application that the applicant or person detained is not entitled" to a writ of habeas corpus. 28 U.S.C. § 2243. Thus, while the Court would ordinarily issue an order to show cause, it exercises its discretion to forgo that step here. *Id.*; *see Wottlin v. Fleming*, 136 F.3d 1032, 1034 (5th Cir. 1998). The petition (Dkt. No. 1) is denied.

### 1.    Background

Perez Arellano is a native and citizen of Mexico.  Dkt. No. 1 ¶ 19.  Over 25 years ago, he entered the United States illegally.  *Id.* ¶ 5.  Last month, ICE detained Perez Arellano and placed him into removal proceedings.  *Id.* ¶¶ 5–6.  A Notice to Appear charged him with removability as an alien present in the United States without having been admitted.  *Id.* ¶ 6; *see* 8 U.S.C. §§ 1182(a)(6)(A)(i).

Perez Arellano has not requested a bond hearing before an immigration judge.  *Id.* ¶ 19.  Even so, any request would have been denied for lack of jurisdiction in light of the Board of Immigration Appeals' recent decision in *Matter of Yajure Hurtado*, holding that aliens present in the United States without admission must be detained without bond under Section 1225(b)(2)(A) of the INA for the duration of their removal proceedings.  29 I. & N. Dec. 216, 220 (BIA 2025).

On February 5, 2026, Perez Arellano filed a petition for a writ of habeas corpus.  Dkt. No. 1.  The petition raises a single ground for habeas relief: that Perez Arellano is part of a class action certified by the Central District of California in *Maldonado Bautista v. Santacruz*.  *See* 5:25-CV-1873, 2025 WL 3289861 (C.D. Cal. Nov. 20, 2025) (granting declaratory relief to petitioners).  There, the Central District purported to require bond hearings for a Bond Eligible Class consisting of all present and future aliens who entered or will enter the country illegally without being caught, subject to certain limited exceptions.  *See* 5:25-CV-1873, 2025 WL 3288403, at *9 (C.D. Cal. Nov. 25, 2025) (class-certification order).  In a later order, the Central District said that it was vacating an internal government policy memorandum mandating detention without bond.  *See* __ F. Supp. 3d __, 2025 WL 3713982, at *4 (C.D. Cal. Dec. 18, 2025).  Then, despite an ongoing appeal and the absence

of any complaint demanding its vacatur, the Central District issued an order purporting to vacate *Yajure Hurtado*. ___ F. Supp. 3d ___, 2026 WL 468284, at *10 (C.D. Cal. Feb. 18, 2026).[1]

## 2.    Legal Standard

"[A]bsent suspension, the writ of habeas corpus remains available to every individual detained within the United States." *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S. Const. art. I, § 9, cl. 2).  With 28 U.S.C. § 2241, Congress authorized federal courts to resolve habeas petitions, including in immigration-detention cases. *Zadvydas v. Davis*, 533 U.S. 678, 687–88 (2001).  Habeas exists solely to "grant relief from unlawful imprisonment or custody." *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976).  Thus, for the writ to issue, the petitioner must be "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995).  A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require." 28 U.S.C. § 2243.

## 3.    Analysis

### A.    Sections 1225 and 1226

At its heart, this case involves the interplay between two related statutes.  First is Section 1225(b)(2)(A), the INA's mandatory-detention provision.  That statute sets out detention requirements for "applicant[s] for admission" to the United States. 8 U.S.C. § 1225(b)(2)(A).  Specifically, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly

---

[1] The Court previously considered additional briefing on the issue raised by petitioners from both the United States' and detainee's perspective. *See Calderon Lopez v. Lyons*, No. 1:25-CV-226, Dkt. Nos. 9; 11 (N.D. Tex.); *Jandres-Ordonez v. Bondi*, No. 6:25-CV-084, Dkt. Nos. 13; 16; 17 (N.D. Tex.).

and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title." *Id.* Subject to certain narrow exceptions,[2] Section 1225(b)(2)(A) "mandate[s] detention of applicants for admission until certain [removal] proceedings have concluded." *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). Nothing in Section 1225 "says anything whatsoever about bond hearings." *Id.*

Section 1226(a), on the other hand, permits discretionary detention. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Instead of detention, the Attorney General "may" release the alien on bond, "[e]xcept as provided in subsection (c)." *Id.* § 1226(a), (2)(A)–(B). Section 1226(c) in turn requires the Attorney General to "take into custody any alien" who is inadmissible or removable for involvement in certain criminal offenses. *Id.* § 1226(c)(1)(A)–(E); *see Jennings*, 583 U.S. at 303. If Section 1226(c) does not apply, and if an alien is released on bond pending removal, the Attorney General may still re-detain him "at any time." 8 U.S.C. § 1226(b).

For many years, the government provided bond hearings under Section 1226(a) to aliens who entered the United States without admission and resided here illegally, often for decades. Then, in July 2025, the U.S. Department of Homeland Security distributed an internal policy (which was later leaked) titled "Interim Guidance Regarding Detention Authority for Applicants for Admission." *See Maldonado Vazquez v. Feeley*, ___ F. Supp. 3d

---

[2] The Secretary of Homeland Security may temporarily parole into the United States "any alien applying for admission" on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see Biden v. Texas*, 597 U.S. 785, 806 (2022). But once the purposes of the parole have been served, the alien must immediately be returned to custody, and his case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

___, No. 2:25-CV-1542, 2025 WL 2676082, at *5 & n.2 (D. Nev. Sept. 17, 2025) (describing the leaked DHS policy and noting that the government did not contest its authenticity).  The policy advised that DHS, in coordination with the U.S. Department of Justice, "revisited its legal position" and concluded that Section 1225, not Section 1226, "is the applicable immigration detention authority for all applicants for admission."  *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, AILA Doc. No. 25071607, Am. Immigr. Laws. Ass'n (July 8, 2025).[3]  Thus, DHS maintained the position— which the BIA later adopted in *Yajure Hurtado*, 29 I. & N. Dec. at 220—that all aliens who entered the country without admission are ineligible for bond.

The BIA acknowledged in *Yajure Hurtado* that "for years Immigration Judges have conducted bond hearings for aliens who entered the United States without inspection."  *Id.* at 225 n.6.  But it did "not recall either DHS or its predecessor, the Immigration and Naturalization Service," ever challenging that practice.  *Id.*  After reviewing the parties' contentions, the BIA determined that immigration judges lack authority to grant bond hearings to aliens who enter the United States without admission.  *Id.* at 229.  Thus, two independent agency actions—the DHS policy and the BIA decision in *Yajure Hurtado*— concluded that aliens who enter the United States without admission are not entitled to bond hearings.

---

[3] https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission [https://perma.cc/5GKM-JYGX]

B.     *Maldonado Bautista* **does not require this Court to grant relief.**

i.     **Arguments Raised in Relation to** *Maldonado Bautista*

Perez Arellano's claim rests entirely upon four orders issued by the Central District of California in *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873.  The *Maldonado Bautista* petitioners were aliens detained by ICE during an operation in Los Angeles.  *Calderon Lopez*, 2025 WL 3683918, at *2.  While the individual petitioners were released in July 2025, the case continued into the fall on the merits.  *See id.* at *3.

First, on November 20, 2025, the Central District issued a declaratory judgment stating that the INA's plain text required the petitioners to receive bond hearings pursuant to Section 1226.  *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3289861, at *11 (C.D. Cal. Nov. 20, 2025).  The order did not issue any preclusive relief, and the Central District further declined to enter final judgment.  *Id.*

Second, on November 25, 2025, the Central District—still retaining jurisdiction over the matter—certified the Bond Eligible Class, in which Perez Arellano claims membership. *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3288403, at *9.  The purported class consists of all aliens "who (1) have entered or will enter the United States without inspection; (2) were not or will not be apprehended upon arrival; and (3) are not or will not be subject to detention" under Section 1225(b)(1), Section 1226(c), or Section 1231 "at the time [DHS] makes an initial custody determination."  *Id.*  Upon creating the class, the Central District purported to "extend the same declaratory relief granted to [the] Petitioners to the Bond Eligible Class as a whole."  *Id.*  Once again, the Central District did not issue preclusive relief or enter a final judgment.  *Id.*

– 6 –

Third, on December 18, the Central District entered an order clarifying its relief. The Central District purported to vacate as unlawful the DHS policy to detain illegal aliens under Section 1225 rather than Section 1226. *Maldonado Bautista v. Santacruz*, No. 5:25-CV-1873, 2025 WL 3713982, at *4.[4] But it expressly declined to vacate *Yajure Hurtado*—which independently prevents immigration judges from holding bond hearings for non-admitted aliens. *Id.* at *3.

Fourth, on February 18, 2026, the Central District issued an order purporting to vacate *Yajure Hurtado*. 2026 WL 468284, at *12. That order acknowledged final judgment had already been entered, but claimed that the additional relief of vacatur against *Yajure Hurtado* was purely a means to "execute the judgment" that vacated DHS's other policy. *Id.* at *6. While the order suggests the plaintiffs moved to vacate *Yajure Hurtado*, there is no suggestion in the record or the February 18 order that the parties had ever sought such relief through a complaint. *See id.* at *6–7.

Perez Arellano—an apparent member of the purported Bond Eligible Class—argues that *Maldonado Bautista* requires the Court to either release him within one day or order that the respondents provide him a bond hearing under Section 1226(a) within a week. Dkt. No. 1 ¶¶ 10–11. Again, the Court previously addressed and rejected this argument in a lengthy order. *See Calderon Lopez*, 2025 WL 3683918. The Central District's February 18 order

---

[4] That same day, the Central District entered an omnibus opinion recapitulating its discussion in the prior three orders without making substantive revisions to the prior orders. *Maldonado Bautista v. Santacruz*, ___ F. Supp. 3d ___, No. 5:25-CV-1873, 2025 WL 3713987, at *1 n.1 (C.D. Cal. Dec. 18, 2025). Because this order is the only one currently slated for publication in the Federal Supplement, one would be forgiven for mistaking it as the relevant order governing this case. But since the omnibus order merely describes what already happened in the case without making substantive changes, it is the original three orders and the subsequent February 18 order that are the proper subject of this petition.

– 7 –

purporting to vacate *Yajure Hurtado* is immaterial to this Court's analysis.  Nevertheless, the

Court will summarize its reasoning.  Here, as in *Calderon Lopez*, the Court recognizes that it

is unusual to address the authority of another court to resolve claims before it.  But doing so

is necessary here because Perez Arellano claims these orders are binding upon this Court.

"While the conclusions of another court, when enforced onto a peer court, are generally

'unassailable collaterally,' an exception has always existed for 'lack of jurisdiction.'"

*Calderon Lopez*, 2025 WL 3683918, at * 6 (quoting *Treinies v. Sunshine Mining Co.*, 308 U.S.

66, 78 (1939)); *see also Ex parte Watkins*, 28 U.S. (3 Pet.) 193, 202–03 (1830) (Marshall, C.J.)

(same).  Thus, the Court considers whether the *Maldonado Bautista* orders are binding upon

it.  For two independent reasons, the orders are legal nullities and are not binding on the

Court.[5]

     First, the INA deprives the Central District of jurisdiction over the purported class

action and challenges to the validity of the bond system.  One provision, 8 U.S.C.

§ 1252(e)(3)(A), provides, "Judicial review of . . . section 1225(b) of this title and its

implementation is available in an action instituted in the United States District Court for the

---

[5] In *Calderon Lopez*, this Court determined that the *Maldonado Bautista* orders violated Article III's
prohibition on advisory opinions.  *See* 2025 WL 3683918, at *7–9.  This was because the Central
District's December 18 order declined to vacate *Yajure Hurtado*.  But its February 18 order purports
to make that judgment.  *See* 2026 WL 468284, at *10.  Putting aside the other jurisdictional issues
discussed below, the new order would seem to resolve the advisory opinion problem.

That said, the new order is unusual.  For one, it is abnormal to enter judgment mid-appeal.  *Cf.
Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58–59 (1982) (collecting cases).  It is abnormal
to enter relief not requested through an amended complaint.  *See Hager v. Brinker Tex., Inc.*, 102 F.4th
692, 705–06 (5th Cir. 2024).  It is at least notable that the amended judgment claims to merely
"execute the judgment" when *Yajure Hurtado* was not subject to the original judgment in any form.
*Compare* 2026 WL 468284, at *6 (the February 18 order), *with* 2025 WL 3713982, at *3 (previously
declining to vacate).  And it is also concerning that this judgment—which purports to bind all other
federal district judges in the Nation—reversed the Central District's prior course with almost no
explanation.  *See* 2026 WL 468284, at *10 (calling the vacatur "a formality").

District of Columbia," limiting such actions to, among other things, "whether . . . a regulation, or a written policy directive, written procedure issued by or under the authority of the Attorney General to implement such section" is either inconsistent with the INA or otherwise unlawful.  Another provision provides that "no court may . . . certify a class under Rule 23 of the Federal Rules of Civil Procedure in any action for which judicial review is authorized under a subsequent paragraph of this subsection"—namely, Section 1252(e)(3)(A).  *See* 8 U.S.C. § 1252(e)(1)(B).  In other words, both provisions indicate that a challenge to the validity of the DHS policy—as well as a class action to that same end—are only proper in the District for the District of Columbia, not the Central District of California.  *See Calderon Lopez*, 2025 WL 3683918, at *10–11.

The Central District tried to distinguish *Maldonado Bautista* as arising under Section 1226, but the plain language of the complaint and the Central District's own reasoning indicate otherwise.  *See id.*  To object that one statute (Section 1226) should apply when another is being presently applied (Section 1225) admits that the challenge arises under the latter statute.  Given the expansive and unambiguous language of the judicial-review provisions, the Central District lacked statutory authorization to declare the policy unlawful.  *See Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 33 (D.D.C. 2020) (Jackson, J.) (noting that the provisions "sweep[] broadly" and encompass "DHS internal memoranda" such as the one challenged in *Maldonado Bautista*).

Second, the unusual structure of the purported relief in *Maldonado Bautista* would necessitate one of two courses of action—denying this petition and ordering Perez Arellano to refile in the Central District or adopting the Central District's reasoning as binding on this Court—both of which would require this Court to rebuke Supreme Court precedent.

– 9 –

*Calderon Lopez*, 2025 WL 3683918, at \*12–14.  The first approach would suggest that Perez Arellano's petition should be denied so it can be pursued in the Central District.  *Id.* at \*12.  But doing so would require this Court to ignore the Supreme Court's admonition that "jurisdiction lies in only one district: the district of confinement."  *Id.* (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)).  The other approach—treating the Central District's orders as binding on all other district courts—"is even less acceptable than the last."  *Id.* at \*13.  Not only would it act as an end-run on the INA's prohibition against habeas class actions for injunctive relief, *see Garland v. Aleman Gonzales*, 596 U.S. 543, 554–55 (2022), it would also form a type of civil action that strongly resembles the universal injunction, which the Supreme Court rejected in *Trump v. CASA, Inc.* as exceeding the courts' authority under the Judiciary Act of 1789.  606 U.S. 831, 850 (2025).[6]

Thus, the Central District has plainly exceeded its authority under the INA and Judiciary Act of 1789.  In so doing, it necessarily transgresses Congress's constitutional authority to limit when and where a federal court may rule on certain claims.  *See* Art. III, §§ 1–2.  While any such excess of judicial power is a serious error, the Central District's rulings, as explained above, are particularly egregious.

### ii.    The Role of Res Judicata

Notwithstanding these problems, another district court recently suggested that all district courts must nevertheless accept the *Maldonado Bautista* orders as binding.  *Samayoa v. Smith*, No. 5:25-CV-190, 2026 WL 483243 (W.D. Ky. Feb. 20, 2026).  The *Samayoa* court's

---

[6] It is enough that *Maldonado Bautista* would require this Court to reject Supreme Court precedent.  But the problem raised by this purported class action is rendered all the more severe in light of the Fifth Circuit's decision in *Buenrostro-Mendez v*, which obliges this Court to deny the very relief demanded by the class action.  *See* 166 F.4th at 498.

thorough, thoughtful analysis recognizes, as other scrutinizing courts have, the serious questions regarding the Central District's authority.  But, it reasons, res judicata requires granting habeas relief because the underlying jurisdictional issues in *Maldonado Bautista* were "fully and fairly contested and actually decided."  *Id.* at *1 (citing Restatement (Second) of Judgments § 33).  This Court respectfully disagrees for two reasons.

     a.  **Res judicata does not apply to this novel quasi-class action.**

  First, the *Samayoa* court reasons that res judicata precludes denying relief.  But that point gives too much credence to the vehicle involved in *Maldonado Bautista*.  This is not a run-of-the-mill individual action, where offensive nonmutual collateral estoppel would not apply to a government defendant.  *See id.* at *6 (citing *United States v. Mendoza*, 464 U.S. 154, 160 (1984)).  This is also not a run-of-the-mill class action, where class members seek their relief in the court that issued the class-action relief.  The hybrid nature of this action is far from "settled law," *id*, and courts are not bound to treat this universal injunction dressed as a class action with the same strictures of res judicata owed to class actions generally.

  Start with the typical lawsuit: discrete plaintiffs versus discrete defendants.  Here, as the *Samayoa* court observes, the law is settled.  Whatever the constitutional wisdom may be of applying res judicata to subject-matter jurisdiction in federal court,[7] the Supreme Court has held that the first federal judgment on the merits, even if its subject-matter jurisdiction is open to attack, is preclusive as to the second under the doctrine of res judicata.  *See Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 n.9 (1982); *Samayoa*, 2026 WL 483243, at *5.  That is the case even though, as the Supreme Court has observed, "[s]ubject-matter jurisdiction . . . functions as a restriction on federal power, and contributes

---

[7] *See generally* William Baude, The Judgment Power, 96 U. Chi. L. Rev. 1807 (2008).

to the characterization of the federal sovereign," such that common-law rules such as estoppel do not trump Article III.  *Ins. Corp. of Ireland*, 456 U.S. at 702.  The reason for treating res judicata differently is prudential: "Where adversary parties appear," the reasoning goes, "a court must have the power to determine whether or not it has jurisdiction."  *Stoll v. Gottlieb*, 305 U.S. 165, 171 (1938).  To hold otherwise would open the door to ceaseless re-litigation and disobedience to court orders.

But since Article III generally trumps common-law doctrine, this means that "nonmutual offensive *collateral estoppel* is not to be extended to the United States."  *United States v. Mendoza*, 464 U.S. 154, 158–59 (1984) (emphasis added).  Collateral estoppel is a closely related doctrine that provides that a necessary court judgment "is conclusive in a subsequent suit based on a different cause of action involving a party to the prior litigation," whereas res judicata only governs "a final judgment on the merits" as to "parties or their privies on the same cause of action."  *Id.* at 158 & n.3.  Res judicata is binding on the federal government; collateral estoppel is not.  Aside from Article III concerns, the Supreme Court observed that "allowing nonmutual collateral estoppel . . . would substantially thwart the development of important questions of law by freezing the first final decision rendered on a particular legal issue," *id.* at 160, much like the impermissible universal injunction, *CASA*, 606 U.S. at 855–56; *accord Samayoa*, 2026 WL 483243, at *6.

Next, consider the typical class action.  Class certification "is the critical act which reifies the unnamed class members and, critically, renders them subject to the court's power."  *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 250 (5th Cir. 2020) (quoting *In re Checking Account Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015)).  "A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting

– 12 –

relief." *Cooper v. Fed. Rsrv. Bank of Richmond*, 467 U.S. 867, 874 (1984). But class members are not bound to victories only: absent narrow scenarios, res judicata binds them to defeat, too. *See Hansberry v. Lee*, 311 U.S. 32, 42 (1940). The upshot of this arrangement is that class members do not get to relitigate the class-action claim elsewhere. *Gillespie v. Crawford*, 858 F.2d 1101, 1102–03 (5th Cir. 1988) (collecting cases). Res judicata protects the class member, but courts likewise police the class member back into the class litigation rather than permitting individual claims.

*Maldonado Bautista* cannot properly be characterized as either a typical individual suit or a class action. It only "has half of the appearance of the class action." *Calderon Lopez*, 2025 WL 3683918, at *14. Like the members of a normal class action, the *Maldonado Bautista* class members claim the benefit of a favorable ruling. Unlike normal class members, though, they cannot pursue it in the court granting class-action relief unless they are detained within its jurisdiction. *See Padilla*, 542 U.S. at 435.[8] Unlike normal class members, the reliance upon individual habeas petitions strongly suggests that aliens may (1) continue raising the merit arguments of *Maldonado Bautista* even if the Ninth Circuit later issues an unfavorable ruling;[9] (2) bring new class actions seeking identical relief to bolster

---

[8] The *Samayoa* court questions whether *Padilla* actually prevents alien petitioners from seeking relief in the Central District of California, describing that decision as based on venue rather than subject-matter jurisdiction. *See* 2026 WL 483243, at *6. Assuming that is correct, it overlooks the reason why *Maldonado Bautista* exists in its current form. The Central District *cannot* grant any such relief because doing so would run headlong into the INA and Supreme Court precedent. *See Aleman-Gonzalez*, 596 U.S. at 554–55; 8 U.S.C. § 1252(f)(1). To date, this Court is only aware of two instances where alien petitioners have requested the *Maldonado-Bautista* court for relief, and the Court is aware of no case in which any alien has refiled his petition in the Central District on those grounds. *See* No. 5:25-CV-1873, Dkt. No. 130 (C.D. Cal. Mar. 11, 2026). If not as a matter of law, then as a matter of practicality, members are required to sue within the district of their detention.

[9] *See Calderon Lopez*, 2025 WL 3683918 at *13.

*Maldonado Bautista* in other courts;[10] and (3) fail on the merits in other courts without recourse to the Central District.

In other words, *Maldonado Bautista* has the nominal structure of a class action with none of the underlying obligations but all of the benefits for the purported class members. The vehicle it is most analogous to is the forbidden universal injunction. *Accord Samayoa*, 2026 WL 483243, at *4 (observing that *Maldonado Bautista* "appears to exhume all the risks and innovations interred" in *CASA, Inc.*). Even assuming that this form of action alone does not merit rejecting preclusion, *see id.* at *5–6 (rejecting jurisdictional concerns as a grounds for attack), it is enough to say that *Maldonado Bautista* cannot properly be characterized as a class action in the true sense of the term. *See Calderon-Lopez*, 2025 WL 3683918, at *13–14. It is far from "settled law," then, that it is to be treated like a standard-fare class action rather than subject to *Mendoza*'s rule that nonmutual offensive collateral estoppel does not apply to the United States. *Cf. Samayoa*, 2026 WL 483243, at *6.[11]

Thus, this Court need not accept *Insurance Corp. of Ireland* and related cases as mandating the res judicata effect of *Maldonado Bautista*. Therefore, this is not an issue of res judicata but one of collateral estoppel. That renders *Mendoza* applicable. That case concerned "a constitutional issue concerning [the government's] administration of the

---

[10] Indeed, the Court is aware of at least two other class actions raising the same grounds as *Maldonado Bautista*, which are confined to detention centers in Washington and Massachusetts. *See Guerrero Orellana v. Moniz*, 408 F. Supp. 3d 167 (D. Mass. 2025); *Rodriguez v. Bostock*, 349 F.R.D. 333 (W.D. Wash. 2025).

[11] In addition to these reasons, it is hard to call the matter settled in light of another competing principle: that the "decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011); *see also Resendiz v. Noem*, No. 4:25-CV-5940, 2026 WL 445497, at *4 (S.D. Tex. Feb. 17, 2026) (Eskridge, J.) (rejecting *Maldonado Bautista* claim on *Camreta* grounds).

[INA], adjudicated against it in a prior action brought by a different party." *Nichols v. Scott*, 69 F.3d 1255, 1270 (5th Cir. 1995); *see* 464 U.S. at 155. *Mendoza*, of course, did not bind the federal government to a previous defeat. 464 U.S. at 160. It framed the issue as one of collateral estoppel, and that is the more appropriate framing here. Thus, alien petitioners cannot rely on the doctrine of res judicata to bind this Court to follow the orders in *Maldonado Bautista*.

> **b.    Even if res judicata applied here, it does not insulate manifest abuses of authority.**

Second, even if the *Samayoa* court were correct in concluding that *Maldonado Bautista* claims in other courts are properly characterized as matters of res judicata, *Samayoa* concedes there is a potential exception to the doctrine. It observes that some courts have limited the doctrine of res judicata in extreme scenarios. 2026 WL 483243, at *5 n.6. Specifically, courts disregard res judicata for an otherwise binding action where the order is "so plainly beyond the court's jurisdiction that its entertaining the action was a manifest abuse of authority." Restatement (Second) of Judgments § 12. Though infrequently raised, it has found acceptance in both district and appellate courts. *See Acetris Health, LLC v. United States*, 949 F.3d 719, 729 & n.4 (Fed. Cir. 2020) (rejecting administrative ruling where agency "lack[ed] colorable jurisdiction" over the case); *Hodge v. Hodge*, 621 F.2d 590, 592 (3d Cir. 1980) (discussing Restatement (Second) of Judgments § 12)); *In re Woods*, 130 B.R. 204, 207 (W.D. Va. 1990) (same).

The *Samayoa* court states that this exception is "haz[y]." 2026 WL 483243, at *5 n.6. But the reasoning is clear as are the rule's limitations. To be clear, there are some decisions on subject-matter jurisdiction that, though they may present questions of Article III authority and bindingness, are subject to reasonable debate. This rule is the product of a

policy strongly favoring the power of a court to determine its own jurisdiction and to ensure the finality of challenged judgments. *Stoll*, 305 U.S. at 171; *In re Woods*, 130 B.R. at 206. So long as the court of first judgment has a "plausible[] interpretation" of Article III or the statutes authorizing jurisdiction, res judicata should apply. *Hohri v. United States*, 793 F.2d 304, 310 (D.C. Cir. 1986) (Bork, J., with Scalia, Starr, Silberman, and Buckley, JJ., dissenting from denial of rehearing en banc).

But not every judicial decision meets that mark. There are rare cases where, "[n]o matter how hard we squint," judges cannot ignore that their colleagues have crossed over the well-laid yet fragile boundaries of Article III. *Cmty. Servs. in E. Palo Alto v. HHS*, 155 F.4th 1099, 1108 (9th Cir. 2025) (Bumatay & VanDyke, JJ., dissenting from denial of rehearing en banc). In scenarios such as these, it is necessary to remember that federal judges do not derive their authority from the common law, even if they are cloaked with some common-law authority. Their authority comes from Article III. *See Ex Parte Bollman*, 8 U.S. (4 Cranch) 75, 93 (1807) ("[C]ourts which are created by written law, and whose jurisdiction is defined by written law, cannot transcend that jurisdiction."). Thus, "[t]he judicial Power must be understood in light of the Constitution's status as the supreme legal document over lesser sources of law." *Gamble v. United States*, 587 U.S. 678, 719 (2019) (Thomas, J., concurring) (internal quotation marks omitted).

In these rare cases, there is ample justification for rejecting orders that are manifestly beyond a court's authority. The Framers recognized the ability of courts to deprive the people of liberty by overstepping their bounds and acting ultra vires. *See* Decl. of Independence ¶¶ 11, 21; *see also* Baude, *supra*, at 1818. Thus, the Framers ensured that there is no "imperial Judiciary." *CASA, Inc.*, 606 U.S. at 858. They did not give the courts

– 16 –

universal jurisdiction.  *See Calderon Lopez*, 2025 WL 3683918, at *7 (citing *Stanford ex rel. Phillips v. Brandon Nursing & Rehab. Ctr., LLC*, 160 F.4th 118, 137 (5th Cir. 2025) (Oldham, J., dissenting)).  They did not give courts the power to issue advisory opinions.  *See id.*  And they rendered the Judiciary "the least dangerous branch" by depriving it of "influence over either the sword or the purse."  The Federalist No. 78 at 227 (Alexander Hamilton).  In short, an unbridled Judiciary has one of two ends: to be dominant over the other branches of government or to be entirely ignored by them.  Neither is an acceptable course.

Here, the people through Congress chose to strip all district courts except the District for the District of Columbia of jurisdiction to hear this type of class action and challenges to the bond system's validity.  8 U.S.C. §§ 1252(e)(3)(A), 1252(e)(1)(B).  Although ignoring those statutory limitations are concerning enough, the Central District flimsily skirts around the Supreme Court's clear admonition that courts may not employ universal injunctions. *CASA*, 606 U.S. at 855–56.  The only path forward that complies with Article III, then, is to reject the premise that res judicata requires this Court to follow *Maldonado Bautista*. However far res judicata may reach in the federal system, it does not reach so far as to obscure the continuing obligation of federal judges to obey Article III in their own cases and to not give effect to the unauthorized "exercise of raw judicial power."  *Roe v. Wade*, 410 U.S. 179, 222 (1973) (White, J., dissenting).  This is especially so when the result otherwise would upend district court dockets nationwide and require the President to afford relief to tens of thousands of petitioners despite statutory authority and Supreme Court precedent to the contrary.

Thus, for the reasons explained at length in *Calderon Lopez* and in this case, the Central District has transgressed the boundaries of Article III in a manner that is so plain,

– 17 –

and rests on a basis so implausible, that it is a manifest overreach of judicial authority. *See Hohri*, 793 F.2d at 310 (Bork, J., dissenting from denial of rehearing en banc). If anyone should venture a plausible basis for that court's jurisdiction, this Court will listen. Seeing none, this Court declines to apply *Maldonado Bautista* as a matter of res judicata.

**4.   Conclusion**

The Central District's orders lack authority two times over: because they were issued in violation of the INA and because the necessary implications of those orders would require district courts nationwide to rebuke the Supreme Court. Because the Central District acted beyond its authority, its orders are "simply void" and cannot bind this Court. *Calderon Lopez*, 2025 WL 3683918, at *6 (quoting *Williamson v. Berry*, 49 U.S. (8 How.) 495, 540 (1850) (further quotation omitted)). And although Perez Arellano does not challenge the government's underlying statutory construction in his habeas petition, the Court notes that—as an "applicant for admission"— he must be detained without bond under Section 1225(b)(2)(A). *Buenrostro-Mendez*, 2026 WL 323330, at *1. Thus, the petition (Dkt. No. 1) is denied.

The Clerk of Court is directed to serve this Order electronically on the United States Attorney's Office for the Northern District of Texas pursuant to the current Service of Process Agreement for federal habeas petitions under 28 U.S.C. § 2241.

So ordered on March 31, 2026.

JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE